IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIANNE WRIGHT, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | |
| vs. | : | 1:18-CV-1006-CC |
| | : | |
| WAL-MART STORES EAST, LP, | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

This premises liability case is before the Court on Defendant Wal-Mart Stores East, LP's Motion for Summary Judgment [Doc. No. 92].  For the reasons stated below, the Court **GRANTS** the Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiff Dianne Wright ("Plaintiff" or "Mrs. Wright") alleges that on November 6, 2016, she was shopping at the Wal-Mart store (the "Store") in Lithia Springs, Georgia, when she slipped and fell at approximately 1:25 p.m. due to a clear, slippery substance in the water aisle of the beverage area.  (Statement of Material Facts as to Which There is No Genuine Issue to be Tried "DSMF" [Doc. No. 92-2] ¶ 1; Plaintiff's Statement of Material Facts as to Which There Are Genuine Issues for Trial "PSMF" [Doc. No. 97-3] ¶ 1.)  After Mrs. Wright left church, she went to Wal-Mart with her daughter for the sole purpose of obtaining

water, while her daughter obtained personal items.  (PSMF ¶ 2.)  While Mrs. Wright's daughter was in the checkout line, Mrs. Wright walked to the back of the Store to the water aisle and instantly felt herself "sliding" or losing her balance and "just gliding down the aisle."  (Id. ¶ 3.)  After she fell to the ground, Mrs. Wright picked up her purse, retrieved the water, and searched for a manager to report her incident because she was hurt.  (Id. ¶ 4.)  The entire incident was captured on two (2) of Wal-Mart's in-store cameras.[1]  (DSMF ¶ 2.)

Video 1 depicts the aisle along the back wall of the beverage area where it intersects with the end of the "water aisle."  (Id. ¶ 4; PSMF ¶ 14.)  Video 2 shows the "water aisle" as it runs into the back wall, and this is the aisle where Mrs. Wright fell.  (DSMF ¶ 4; PSMF ¶ 14.)  The videos accurately depict the area of Mrs. Wright's fall for a two-hour period.  (DSMF ¶ 4.)

In the front of the water aisle, approximately ten (10) to twenty (20) feet away, is a double door, employee-only entrance that leads to the Store's warehouse, claims department, managers and personnel offices, clock-in and -out station, and the only breakroom/employees lounge in the Store.  (PSMF ¶ 16.)  The employee-only double door is the closest entrance to the dry grocery paper and

---

[1] The two (2) Store videos are attached to Plaintiff Dianne Wright's Deposition, as Exhibit 16, and the nine (9) screenshots, taken from the Store videos, are attached to the Declaration of Asset Protection Manager Isaiah Thomas.  (Id. ¶ 3.)

chemical, dairy, and infant departments and has an adjoining action alley that leads to the door.  (Id. ¶ 17.)

In Video 2, at 1:12:09 p.m., an unknown male customer and two (2) male companions are depicted in the back aisle where it meets the water aisle.  (DSMF ¶¶ 7, 18.)  The male customer drops a bottle from his cart, and it breaks.  (Id.; PSMF ¶ 18(h).)  Video 1 shows the unknown male customer looking down at the broken bottle on the floor.  (DMSF ¶ 8.)  The broken cap can be seen behind him.  (Id.)  In Video 1, the unknown male customer picks up the cap and bottle and hands them to one of his companions in a blue shirt.  (Id. ¶¶ 9, 19.)  In Video 2, the companion in the blue shirt drops the bottle on the floor again and then kicks the broken bottle under the shelving.  (Id. ¶¶ 10, 20.)  The customers then leave.  (Id. ¶¶ 10, 20.)

In Video 2, the broken bottle and cap cannot be seen on the floor.  (Id. ¶ 11.)  The spill substance also cannot be seen in Video 2.  (Id.)  At 1:20:58 p.m., Video 2 shows a woman customer enter from the back of the water aisle where the male customer dropped the bottle.  (PSMF ¶ 18(i).)  At 1:21:26 p.m., the same woman customer notices something on the floor where the bottle was dropped and where Mrs. Wright subsequently fell; she steps in the substance and wipes her left shoe back and forth on the floor in an attempt to remove the substance from her shoe.  (Id. ¶ 18(j).)  She wipes her shoe in the exact location where Mrs. Wright fell.  (Id.)

In Video 2, at 1:25:26 p.m., Mrs. Wright enters from the front of the water aisle, opposite of where the male customer dropped the bottle, and walks towards the back of the aisle. (DSMF ¶ 12; PSMF ¶ 18(k).) In Videos 1 and 2, Plaintiff slips and falls in the same area where the bottle was dropped approximately thirteen (13) minutes earlier and where the woman customer wiped her foot back and forth. (DSMF ¶ 13; PSMF ¶ 18(l).)

Before the substance was cleaned and before Mrs. Wright found a manager to report her incident, a different woman customer, pushing a shopping cart, enters from the back of the water aisle where the male customer dropped the bottle and looks back towards the substance where Mrs. Wright fell. (PSMF ¶ 18(m).) The woman customer pointed in the substance's direction and warned a male customer of the substance. (Id. ¶ 18(n).)

At 12:57:06 p.m., on November 6, 2016, approximately twenty-eight (28) minutes before Mrs. Wright's fall, employee Sophia Gusmao walked to the end of the water aisle. (DSMF ¶ 14.) She stopped within a step or two of the exact area where Mrs. Wright later fell to pick up a case of water for an online order. (Id.) Gusmao avers in a declaration that the aisle floor was clean and hazard free. (Id. ¶ 16.) According to her testimony, there was no spilled substance on the aisle floor when she was picking up her case of water at 12:57:06 p.m. (Id.)

There is a factual dispute, however, as to whether Gusmao inspected or reasonably inspected the area.  In this regard, Plaintiff contends that Video 2 shows that Gusmao did not actively look at the aisle floor for any hazards, that she was distracted by a device held in her right hand, and that she actually walked past a paper hazard without picking it up.  (PSMF ¶ 18(g).)  Trevor Johnson, Dry Grocery manager of the area where Mrs. Wright fell, testified that, based on Video 2, the paper hazard on the floor would indicate that no one inspected the aisle.  (Id. ¶ 38.)  Manager Johnson testified that the hazard should have been removed.  (Id. ¶ 39.)

Defendant's corporate representative, Victor Effah, admitted that Wal-Mart has no written documentation regarding whether any of its employees performed any inspections of the water aisle, including a safety sweep, zone, or clean-as-you-go on November 6, 2016, prior to Mrs. Wright's fall.  (Id. ¶ 32.)  When asked "how do you all determine when a sweep has actually been performed," Mr. Effah replied "[w]hen the floor is free of debris."  (Id. ¶ 34.)  Wal-Mart admits that it does not (1) "generate or maintain records" or logs of its inspections, (2) "retain or archive the work schedules" of its employees, or (3) "set times when inspections must be performed."  (Id. ¶ 46.)

Videos 1 and 2 show that no employee was present in the water aisle when the spill occurred.  (DSMF ¶ 21.)  No employee walked through the water aisle

after the spill was created and before Plaintiff's fall, thirteen (13) minutes and twenty-five (25) seconds later. (Id. ¶ 22.) The Store videos show, and Mrs. Wright admitted, no employee was in the aisle at the time of her fall. (Id. ¶ 23.)

No one reported the spill to any Wal-Mart employee before Mrs. Wright's fall.[2] (Id. ¶ 24.) Both Support Manager Sarah Krasner and Cap II Supervisor Marcellus Bonner were working on November 6, 2016, in the Dry Goods department, which included the water aisle. (Id. ¶ 25.) They averred they had no knowledge of the spill in the water aisle before Mrs. Wright's incident. (Id.) Bonner averred that none of the fifteen (15) employees under his supervision who worked in the Dry Goods department reported the spill to him. (Id. ¶ 26.)

General Merchandise Support Manager Dawkins was in the front of the Store checking returns with Grocery Support Manager Sarah Krasner and was unaware of the spill until Mrs. Wright reported it. (Id. ¶ 27.) Dawkins and Krasner came to the accident scene after Mrs. Wright's fall to assist with guarding the spill and did not witness Mrs. Wright's fall. (Id. ¶ 28.) Co-Manager Anthony Santos, who was the salaried member of management to investigate the incident, testified no one had reported the spill until Mrs. Wright did so and no employee knew of

---

[2] Plaintiff denies this statement of fact and several others as self-serving statements that lack evidence. However, the statements are supported by deposition and declaration testimony. Therefore, the Court deems the statements admitted. (See DSMF ¶¶ 24-27, 29-30, 61-63.)

the spill before Mrs. Wright's fall.  (<u>Id.</u> ¶ 29.)  There is no evidence that any employee had any actual knowledge of the spill before Mrs. Wright's fall.  (<u>Id.</u> ¶ 30.)

Mrs. Wright testified she walked down the water aisle to pick up a case of water on the back wall, when she fell on a clear substance.  (<u>Id.</u> ¶ 31.) She identified herself in the video falling at 1:25:34-35 p.m.  (<u>Id.</u>)  Mrs. Wright testified she was looking where she was walking as she entered the water aisle, and it appeared clean and safe.  (<u>Id.</u> ¶ 32.)  She saw nothing on the aisle floor that gave her any concern before she fell.  (<u>Id.</u> ¶ 33.)  Nothing in the aisle blocked or obstructed her view of the floor.  (<u>Id.</u> ¶ 34.)  She admitted the Store was well-lighted.  (<u>Id.</u> ¶ 35.)

Mrs. Wright did not know what she had slipped on.  (<u>Id.</u> ¶ 36.)  Mrs. Wright never saw the spill before or immediately after her fall.  (<u>Id.</u>)  When Mrs. Wright returned to the water aisle after reporting her fall, she stated she could not see the clear spill, only the smudge caused by her foot slipping in the spill.  (<u>Id.</u> ¶ 37.)  Mrs. Wright could not identify the spilled substance or its source.  (<u>Id.</u> ¶ 38.)

Mrs. Wright admitted she did not see the slippery substance before or after her fall because it was clear and blended with the tan floor.  (<u>Id.</u> ¶ 39.)  Mrs. Wright admitted she was looking down the aisle, but not actually at the floor; however, she testified she would not have been able to see anything on the floor even if she had looked.  (<u>Id.</u> ¶ 40.)  Mrs. Wright admitted the substance was not visible, even

if she had been standing directly over it.  (<u>Id.</u> ¶ 41.)  When questioned by her own

counsel, Mrs. Wright stated:

> Q.     And why do you think you cannot see that substance on that video?
>
> A.     It blends in with the color of the floor.
>
> Q.     And do you know if it blended in with the floor when you were at
> Walmart?  Were you able to tell that this substance was on the floor while
> you were there?
>
> A.     I wasn't able to see it, because I mean, it blended in the floor.  I just
> know I slid in something wet.
>
> Q.     So even had you been looking down at the moment you fell, do you
> believe you would have seen the substance?
>
> A.     No.

(<u>Id.</u>)

Mrs. Wright admitted she did not know what the clear substance was that

caused her fall, where it came from, or how it got on the floor.  (<u>Id.</u> ¶ 42.)  Mrs.

Wright admitted she did not know how long it had been on the floor before her

fall or if it had been on the floor an extended period of time.  (<u>Id.</u> ¶ 43.)  Mrs. Wright

admitted she did not know if the spilled substance was created by a customer or

employee, adult or child.  (<u>Id.</u> ¶ 44.)  Mrs. Wright did not know the last time the

area had been inspected.  (<u>Id.</u> ¶ 45.)

General Merchandise Support Manager Yolanda Dawkins and Dry Grocery Department Co-Manager Anthony Santos initially responded to Mrs. Wright's incident.  (PSMF ¶ 5.)  Mrs. Wright directed them to the end of the aisle where the substance was located, but she did not walk back to the area where she fell to look at the substance she described as slippery and wet.  (Id. ¶ 6.)  Mrs. Wright overheard the employees who responded to her incident discussing why there was no wet floor sign in the area where she fell.  (Id. ¶ 7.)  The employees were unable to remove all of the substance off the floor, so they called a maintenance employee to use a floor scrubber machine to clean it up.  (Id. ¶ 9.)  The maintenance employee cleaned the area with a machine.  (Id. ¶ 18(r).)

Co-Manager Santos, during his investigation, found a clear, slippery substance on the water aisle floor, which was hard to see until you got "really close up on it."  (DSMF ¶ 46.)  By examining the spill, Co-Manager Santos identified the clear substance as tire shine or possibly "Goo Gone."  (Id. ¶ 47.)  Goo Gone was not a water product or any drink product sold on the water aisle or in the beverage department.  (Id. ¶ 48.)  Co-Manager Santos also confirmed the substance was a tire cleaner or Goo Gone based on the shape of the container.  (Id. ¶ 49.)  Co-Manager Santos stated the spill was caused by an unknown customer dropping the bottle.  (Id. ¶ 50.)

General Merchandise Support Manager Dawkins confirmed the spill was clear and difficult to see from a standing position.  (<u>Id.</u> ¶ 51.)  Dawkins testified that she had to actually bend over the spill to photograph the spill.  (<u>Id.</u> ¶ 52.)  Dawkins confirmed the spill was not water, but an oily substance, because when they tried to clean it up with paper towels, it spread further.  (<u>Id.</u> ¶ 53.)  Dawkins testified she examined the broken bottle cap and determined it did not match any product sold in the water aisle.  (<u>Id.</u> ¶ 54.)  Dawkins examined substance on the cap and the paper towels used to clean the substance from the floor, and it did not look or smell like water.  (<u>Id.</u> ¶ 55.)

Wal-Mart has specific policies and procedures regarding the prevention and cleanup of spills and other safety hazards.  (<u>Id.</u> ¶ 56.)  All employees are trained to conduct "zone defense" and "safety sweeps" of their area, meaning they were to visually scan the area they were working in to ensure the floor was clean and clear of any hazards to customers.  (<u>Id.</u>)  If a hazard was found, employees were trained to immediately remove it.[3]  (<u>Id.</u> ¶ 58.)  If the hazard could not be removed, the employee was required to guard the hazard until it could be removed.  (<u>Id.</u>)

---

[3] Plaintiff contends that Video 2 demonstrates the employees were not properly trained to immediately remove hazards found.  However, while the video footage may show that the employees did not act consistently with their training, the video footage does not create a dispute of fact as to whether employees were trained to immediately remove a discovered hazard.

Wal-Mart's Slip, Trip, and Fall Guidelines set forth at least three (3) types of basic inspection practices, which include (1) "clean-as-you-go method," which requires employees to clear their work area as they work, remove trash, and debris, and "[c]lean up spills, debris and slip and trip hazards immediately;" (2) "safety sweeps," which require employees to "check the entire area including floors," visually "look for potential hazards" from "start of shift to close of shift," and "watch for and correct potential hazards" to and from lunch breaks; and (3) "zone," which requires employees to make sure merchandise is in its proper place and ensure the area is clean, nice, and presentable.  (PSMF ¶ 19.)

Furthermore, Wal-Mart's written policies contain demonstrative photos to show employees how to properly perform inspections.  (Id. ¶ 21.)  One of the photographs depicts a female employee working while a piece of paper is on the floor.  (Id. ¶ 22.)  Next to the photograph, Wal-Mart specifies that the floor is not free of debris, and the associate is "not aware of her surroundings" because she bypassed the paper hazard debris on the floor.  (Id. ¶ 23.)  According to the photograph, the employee's behavior is "wrong."  (Id. ¶ 24.)

Store management ensured that all employees were trained on Wal-Mart's policies and procedures through orientation, computer-based learning, and on-the-job training. (DSMF ¶ 60.) Store management sought to ensure that all employees followed these policies and procedures through continual supervision

called "coaching by walking around." (Id. ¶¶ 61-62.) Co-Manager Anthony Santos testified that managers who "coach" the employees on how to perform inspections only coach "as needed." (PSMF ¶ 43.) He further testified that the maintenance employees who physically sweep the floors only sweep "as needed." (Id. ¶ 44.)

Co-Manager Anthony Santos, Support Manager Yolanda Dawkins, Dry Goods Department Manager Trevor Johnson, CAP II Supervisor Marcellus Bonner, Grocery Department Support Manager Sarah Krasner, and Online Grocery Pickup Associate Sophia Hart Gusmao confirmed that they were familiar with and trained upon Lithia Spring Walmart's specific safety policies and procedures regarding the prevention and cleanup of spills and other safety hazards, including safety sweeps, zoning, and visual inspections of the floors, which were in effect on November 6, 2016.  (DSMF ¶ 62.)  On the afternoon of November 6, 2016, CAP II Supervisor Marcellus Bonner and Support Manager for Dry Goods Sarah Krasner both averred they were working in the Dry Goods department, which included the water aisles of the beverage department.  (Id. ¶ 63.)  During the time they were working on November 6, 2016, they followed Walmart safety policies and procedures, including safety sweeps, zoning, and visual inspections.  (Id.)

Three days after Mrs. Wright fell, she sent spoliation correspondence to Defendant to preserve video surveillance footage the day of her injury.  (PSMF ¶ 13.)  Defendant only kept two (2) videos from the incident.  (Id. ¶ 14.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the entry of summary judgment when no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In seeking summary judgment, the moving party bears the initial responsibility to demonstrate that there is no genuine issue as to any material fact and that summary judgment is appropriate.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Allen v. Bd. of Public Educ., 495 F.3d 1306, 1313 (11th Cir. 2007).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

When evaluating the merits of a motion for summary judgment, the court must view all evidence and factual inferences raised by the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts concerning the facts in favor of the non-moving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citation omitted).  The court is not

permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence.  Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

A fact is material if proof of its existence or nonexistence would affect the outcome of the case under controlling substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Additionally, an issue of fact is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party.  Id.  An issue of fact is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or "not significantly probative."  Id. at 249-250.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247-48 (emphasis in original).

## III.   ANALYSIS

### A. Spoliation Claim

Before addressing the merits of Plaintiff's premises liability claim, the Court will address Plaintiff's claim that Defendant failed to preserve video surveillance of the front of the aisle where she fell, despite having received spoliation correspondence from Plaintiff requesting that Defendant preserve video surveillance footage from the day of her injury.  Plaintiff further claims that such

surveillance video would have shown every employee who walked past the water aisle to reach the employee-only double door that leads to the Store's warehouse, claims department, managers and personnel offices, clock-in and -out station, and the only breakroom/employee lounge in the Store.   Plaintiff argues that an adverse inference should be drawn against Defendant regarding whether any employees were in the vicinity to discover the hazard that caused her injury.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Graff v. Baja Marine Corp., 310 F. App'x 298, 301 (11th Cir. 2009) (internal quotation marks and citation omitted).   A district court has broad discretion to impose sanctions for spoliation as part of its "inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005).   As an evidentiary matter, the imposition of spoliation sanctions is governed by federal law in diversity suits.   Id.   However, federal law in the Eleventh Circuit does not set forth specific guidelines in determining whether sanctions for spoliation are appropriate.   Id.   As a result, the spoliation analysis is "informed by Georgia law," which the Eleventh Circuit has found to be "wholly consistent with federal spoliation principles."   Id.

A party seeking spoliation sanctions must meet the initial burden of proving that (1) the missing evidence existed at one time, (2) the alleged spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the movant being able to prove its prima facie case or defense.  In re Delta/Air Tran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).  If spoliation has occurred, Georgia courts further evaluate the following five factors in determining whether spoliation sanctions are warranted: (1) whether the movant was prejudiced as a result of the destruction of evidence; (2) whether any prejudice can be cured; (3) the importance of the evidence; (4) whether the spoliator acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence is not excluded.  Flury, 427 F.3d at 945 (citing Chapman v. Auto Owners Ins. Co., 220 Ga. App. 539, 542, 469 S.E.2d 783 (1996)).

In Flury, the Eleventh Circuit looked to Georgia law for guidance in defining the elements of spoliation and, in the process, arguably diminished the role of bad faith in the spoliation analysis by identifying bad faith as only one factor for consideration.  Stanfill v. Talton, 851 F. Supp. 2d 1346, 1362 (M.D. Ga. 2012).  However, the Eleventh Circuit previously held that "[m]ere negligence in losing or destroying the records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case."  Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997) (internal quotation marks and citation omitted).  The

<u>Bashir</u> court further stated without qualification that, in the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." 119 F.3d at 931 (citation omitted). The Eleventh Circuit recently confirmed this in <u>Tesoriero v. Carnival Corp.</u>, 965 F.3d 1170, 1184 (2020). Thus, a showing of bad faith continues to be required to impose sanctions.

In the case at bar, Plaintiff has not met her burden of showing that spoliation occurred. Plaintiff contends that "there *appears to be* at least seven *potential* cameras that would have captured" every employee who walked past the water aisle to enter the employee-only double door. (Doc. No. 97-1 at 8) (emphasis added). Plaintiff also states that the video evidence "*may have* captured the front of the water aisle." (<u>Id.</u> at 19) (emphasis added). However, only speculation and conjecture back Plaintiff's contentions that there were cameras and that the cameras would have captured footage of this area of the Store. Moreover, even if there were cameras in the places Plaintiff contends, Plaintiff has absolutely no evidence that footage of the day in question from these cameras ever existed.

When Plaintiff deposed Wal-Mart's representative, Victor Effah, Mr. Effah testified that he thought the globes Plaintiff claims to be cameras were lights. (Deposition of Victor Effah "Effah Dep." [Doc. No. 98] at 312:14-21.) Further, assuming they were cameras, Mr. Effah testified that he did not know if they

would be able to show the front end of the beverage area.  (Id. at 312:21-23; 313:8-13.)  Simply put, there is no evidence whatsoever of any additional footage that existed, and Plaintiff's speculation is insufficient to establish a spoliation claim.[4] In re Delta/AirTran Baggage Fee Antitrust Litigation, 770 F. Supp. 2d at 1309.

    B.  Premises Liability Claim

To prevail on a cause of action for negligence under Georgia law, the plaintiff must establish the essential elements of duty, breach of duty, proximate causation and damages.  Black v. Georgia S. & Fla. Ry. Co., 202 Ga. App. 805, 806, 415 S.E.2d 705 (1992).  Under Georgia law, the owner or occupier of real property owes a duty to its invitees to exercise ordinary care in keeping its premises safe. O.C.G.A. § 51-3-1.  "This includes inspecting the premises to discover possible dangerous conditions of which the owner/occupier does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises."  Robinson v. Kroger Co., 268 Ga. 735, 740, 493 S.E.2d 403 (1997) (citations omitted).  By encouraging others to come onto the property to further the purpose of the owner or occupier, the owner or occupier impliedly represents that reasonable care has been exercised to make the premises safe for those who come for that purpose, and that representation is the basis of the owner or occupier's liability for injuries sustained

---

[4] Plaintiff makes no attempt to address the issue of bad faith.

by an invitee in a slip-and-fall case.  Id. at 741.  Notwithstanding the foregoing, a property owner is not an insurer of the safety of entrants, and a mere showing that an injury occurred while on the premises of a proprietor is not sufficient, by itself, to create a presumption of negligence.  Lee v. Food Lion, 243 Ga. App. 819, 820, 534 S.Ed2d 507 (2000); see also Sunlink Health Sys., Inc. v. Pettigrew, 286 Ga. App. 339, 341, 649 S.E.2d 532 (2007) ("[P]roof of a fall, without more, does not give rise to liability on the part of the proprietor.").

To establish an owner's liability for injuries sustained in a slip-and-fall case, the plaintiff must plead and prove: (1) the defendant had actual or constructive knowledge of the hazard; and (2) the plaintiff, despite exercising ordinary care for his or her own personal safety, lacked knowledge of the hazard due to the defendant's actions or to conditions within defendant's control.  Robinson, 268 Ga. at 748.  "The true basis for an owner's liability is his superior knowledge of the existence of a condition that could subject his invitees to an unreasonable risk of injury."  Garrett v. Hanes, 273 Ga. App. 894, 895, 616 S.E.2d 202 (2005) (emphasis added).  Thus, if the owner has no actual or constructive knowledge of the hazard, the owner is entitled to summary judgment.  Drew v. Istar Fin., Inc., 291 Ga. App. 323, 325, 661 S.E.2d 686 (2008).

Here, Plaintiff does not argue that Defendant had actual knowledge of the hazard that caused her fall.  The analysis therefore focuses on constructive

knowledge.  A plaintiff may demonstrate a proprietor's constructive knowledge of a hazard by showing that "(1) a store employee was in the immediate area of the hazard and could have easily seen the substance or (2) the foreign substance remained long enough that ordinary diligence by the store employees should have discovered it."  Johnson v. All Am. Quality Foods, Inc., 340 Ga. App. 664, 666, 798 S.E.2d 274 (2017) (citation omitted).

Defendant is entitled to summary judgment in this case first because there is no evidence that an employee was in the immediate area of the hazard.  The uncontroverted video evidence is that there was no employee on the water aisle from the time the spill occurred until the time of Plaintiff's fall.  In these circumstances, the first method of demonstrating constructive knowledge fails.

Plaintiff also cannot establish constructive knowledge by the first method because the substance on which she slipped was not easily visible.  As such, even if an employee had been in the immediate area of the hazard or had inspected the area pursuant to a reasonable inspection program, the substance would not have been easily discovered and removed.  Georgia law is well established that a proprietor is not liable under these circumstances.  See Womack-Sang v. Publix Super Markets, Inc., No. 1:12-CV-4189-ODE, 2013 WL 12067480, at *8 (N.D. Ga. Nov. 1, 2013), aff'd, 556 F. App'x 912 (11th Cir. 2014) (awarding summary judgment because, among other reasons, liquid on which plaintiff slipped did not

contrast with the tiled floor and was only "barely visible" when "in close proximity"); Brown v. Host/Taco Joint Venture, 305 Ga. App. 248, 250, 699 S.E.2d 439 (2010) (finding no inference of constructive knowledge where the plaintiff admitted that the grease spot on which he slipped "was not easily visible to him prior to the fall"); Hardee's Food Sys. v. Green, 232 Ga. App. 864, 502 S.E.2d 738 (1998) (upholding summary judgment where the plaintiff admitted that the alleged hazard was not readily visible and no evidence suggested that the alleged hazard was on the floor for any length of time); Rodriguez v. City of Augusta, 222 Ga. App. 383, 384, 474 S.E.2d 278 (1996) (holding that defendant was entitled to summary judgment where plaintiff admitted that the alleged dangerous substance was not visible).

In the case at bar, Plaintiff admitted she did not see the slippery substance before or after her fall because it was clear and blended with the tan floor. Plaintiff testified she was looking down the aisle but not actually at the floor; however, she testified she would not have been able to see anything on the floor even if she had looked. Plaintiff admitted the substance was not visible, even if she had been standing directly over it. Plaintiff testified that, even if she had been looking down at the moment she fell, she did not believe she would have seen the substance.

The testimony of employees who investigated the incident corroborated that the spill was invisible or very difficult to see. Support Manager Dawkins

confirmed the spill was clear and difficult to see from a standing position. She testified she had to actually bend over the spill to photograph the spill. Co-Manager Santos similarly testified that his investigation revealed a clear, slippery substance on the water aisle, which was hard to see until getting really close up on it.

Plaintiff tries to create an issue of fact as to the visibility of the hazard by pointing out video evidence of other customers who purportedly noticed the hazard before and after her fall. However, the visibility of the substance after Plaintiff fell is irrelevant. See Host/Taco Joint Venture, 305 Ga. App. at 250 ("Brown's claim that the grease spot could be seen after his fall fails to address the pertinent inquiry as to whether the grease spot was easily visible *before* the fall.") Plaintiff claims that one of the videos shows that, prior to Plaintiff's own fall, a customer noticed something on the floor where the bottle was dropped and where Plaintiff subsequently fell. Plaintiff claims the video shows the customer then stepped in the substance and wiped her left shoe back and forth on the floor in an attempt to remove the substance from her shoe. Notably, if this customer noticed the hazard on the floor, it is nonsensical that she then would have stepped in it. A justifiable or reasonable inference that this customer noticed the substance and that the substance was therefore easily visible cannot be drawn in Plaintiff's favor from the video evidence. Most importantly, this customer was never identified

and never provided sworn testimony regarding what she saw or knew.  Plaintiff urges the Court to deny summary judgment based on her own speculation and conjecture, but her speculation and conjecture are not competent evidence of Defendant's constructive knowledge of the hazard and do not create or demonstrate a genuine issue for trial.  See Anderson, 477 U.S. at 249-50.  Plaintiff's failure to point to evidence demonstrating that the hazard was easily visible prior to her fall and her admission that it was not are fatal to her claim.

When a plaintiff cannot show that an employee was in the position to have easily seen a hazard and removed it, the plaintiff must show that the hazard was on the floor for such a time that it would have been discovered and removed had the proprietor exercised reasonable care in inspecting the premises.  Sanderson Farms, Inc. v. Atkins, 310 Ga. 423, 426, 713 S.E.2d 483 (2001).  As explained below, video evidence establishes that the substance at issue in this case was on the floor of the water aisle for an insufficient amount of time to have been discovered and removed.

Under Georgia law, "the proprietor may . . . produce evidence . . . that the foreign substance had not been on the premises long enough to have been discovered by a reasonable inspection, regardless of whether inspection procedures had been instituted and complied with."  Johnson v. Autozone, 219 Ga. App. 390, 394, 465 S.E.2d 463 (1995); see also All Am. Quality Foods v. Smith,

340 Ga. App. 393, 396, 797 S.E.2d 259 (2017) (finding that hazard on floor for six or seven minutes was present for insufficient period of time as a matter of law to hold that proprietor should have discovered and removed the liquid prior to the plaintiff's fall); Gleaton v. APAC-Georgia, 228 Ga. App. 52, 55, 491 S.E.2d 138 (1997) ("In cases involving grocery stores, parking lots, and restaurants, we have found that 15 or 20 minutes was a legally insufficient amount of time for a proprietor to discover a foreign substance on the floor."); Mazur v. Food Giant, 183 Ga. App. 453, 454, 359 S.E.2d 178 (1987) ("Where it appears a foreign object had not been present for more than 10 to 15 minutes, the allegations show no actionable negligence on the part of the proprietor in failing to discover it.").

In Johnson, the proprietor produced evidence that the hazard had existed only 15 to 20 minutes prior to the plaintiff's fall. The Georgia Court of Appeals granted the proprietor summary judgment, holding that the hazard had not been on the premises for a sufficient period of time to have been discovered by a reasonable inspection procedure. Id.

The uncontradicted evidence indicates that the spill in this case was created by an unknown customer or customers thirteen (13) minutes and twenty-five (25) seconds prior to Plaintiff's fall. Based on the authorities cited above, this is a legally insufficient period of time for Wal-Mart to have discovered and removed the substance on which Plaintiff slipped.

In light of the above evidence and findings, Plaintiff's arguments about the inadequacies of Wal-Mart's inspection program and whether proper inspections were carried out prior to her fall are irrelevant. See Hartman v. Clark, 341 Ga. App. 513, 514, 801 S.E.2d 66 (2017) (holding that any factual questions about inspection procedures and whether they were followed were irrelevant where ten-minute period of time that hazard was on floor was insufficient to demonstrate actionable negligence by proprietor); All Am. Quality Foods, 340 Ga. App. at 395 (finding inspection-related evidence irrelevant where video evidence showed that hazardous substance was on grocery store floor for insufficient amount of time to have been discovered and removed). In sum, Plaintiff cannot rely on any argument or evidence that Wal-Mart failed to put in place or follow a reasonable inspection policy to create an issue of fact.

The evidence of record establishes, plainly and palpably, that Wal-Mart did not have actual or constructive knowledge of the presence of this clear substance on the floor of the water aisle, which had only been present thirteen (13) minutes and twenty-five (25) seconds before Plaintiff slipped and fell. In response to Defendant's Motion for Summary Judgment, Plaintiff had the burden to come forward with specific evidence creating a genuine issue of material fact concerning whether Wal-Mart's knowledge of the hazard was superior. Plaintiff has not

satisfied that burden.  For that reason, Wal-Mart is entitled to summary judgment as a matter of law.

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant Wal-Mart Stores East, LP's Motion for Summary Judgment [Doc. No. 92].


SO ORDERED this <u>11th</u> day of <u>January</u>, 2021.


<u>*s/  CLARENCE COOPER*</u>
CLARENCE COOPER
SENIOR UNITED STATES DISTRICT JUDGE